IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 36846-7-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| ILARIO MANJARES, | ) | |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — Ilario Manjares appeals convictions for two counts of felony harassment. He concedes that sufficient evidence supports the required elements of a threat to kill that placed two victims in fear the threat would be carried out. But he contends the evidence was insufficient to prove that his threats created an *objectively reasonable* fear of being killed.

The evidence was sufficient. We affirm.

FACTS AND PROCEDURAL BACKGROUND

Ilario Manjares testified in the trial below, and we begin with his own account of his bizarre behavior on the night of his offenses.

At around 9:30 one night in November 2018, Mr. Manjares went looking for his wife, Hailey,[1] in Sunnyside. Mr. Manjares and Hailey were in the process of divorcing, and according to Mr. Manjares, she was denying him visitation with their two children. When he received a text that she was at a bar, Egley's, he drove there in his white SUV.[2] On arriving, he encountered four men out front who he took to be bouncers, and he asked them if Hailey was there. Mr. Manjares claims they became confrontational with him, which Mr. Manjares later testified made him believe Hailey *was* there. When they threatened to shoot him, Mr. Manjares says, he drove around to the back of the bar, since he had not seen Hailey's car out front.

Behind the bar, he saw a black Mitsubishi that he claims was the exact same vehicle as one belonging to a coworker of Hailey's. He approached the occupant of the car, a woman, and questioned her about Hailey's whereabouts. He got the impression the woman "was trying to like[,] not tell." Report of Proceedings (RP) at 323. When the woman drove away she circled the bar, leading Mr. Manjares to believe that Hailey was probably inside and was "gonna jump out in a minute and hop in the car with her," so he followed the Mitsubishi. *Id.* When the woman drove away from the bar, Mr. Manjares followed her.

---

[1] Because all of the record references to Ms. Manjares are by her first name, we refer to her throughout as Hailey. We intend no disrespect.

[2] Sport utility vehicle.

The woman stopped in front of a home where a man was standing. Mr. Manjares pulled in behind her. Mr. Manjares testified the man in front of the home looked familiar, too, like someone "that also goes over there to my wife's work." RP at 326. Mr. Manjares said he was persistent in asking about Hailey and his children and was irritated that the couple would not tell him anything. He finally gave up and left.

He testified that he then drove to a nearby gas station, where he saw a couple in a car who looked like people he had seen at Egley's. He followed them to an apartment complex where they stopped and parked. He parked nearby and walked to their car, where a woman was sitting in the driver's seat and a man was sitting in the front passenger's seat. He confronted them from the passenger's side about the whereabouts of Hailey and his children. He observed that they were possibly afraid of him, "but I don't see why cause . . . I wasn't there for them." RP at 333. When the woman backed out and drove out of the parking lot and away, Mr. Manjares started to follow them but then changed his mind.

Not long thereafter, Mr. Manjares rolled his SUV while being pursued by a police officer. He testified he was not trying to elude the officer and did not notice "at first" that a police car with lights and siren activated was following him. RP at 340. He claims to have seen the officer's car only when he was "further down the tracks." *Id.*

Mr. Manjares was charged with attempting to elude a police vehicle and—based on 911 calls and statements made by the two couples he had confronted that night about

the whereabouts of Hailey—with two counts of second degree assault and two counts of felony harassment.

All of the victims testified at Mr. Manjares's trial. Since his challenge on appeal is to whether sufficient evidence supports his convictions for felony harassment, we recount the evidence provided by witnesses Alejandra Morfin Ixtas and Hector Gallardo in more detail.

On the night of the offenses, Ms. Morfin had plans to meet friends at Egley's. She drove to the back of the bar, where she always parks. The back parking area was dark and no other cars were there. As she parked, she sensed someone staring at her and turned to see Mr. Manjares standing close to her driver's window, his face almost touching the window. She had never seen Mr. Manjares before. He asked about Hailey and his two daughters. Ms. Morfin told him she was sorry, but she did not know a Hailey.

Ms. Morfin had not turned off her car and decided she would find another place to park. As she circled the bar looking for another spot, none was available in the front, and she noticed that a white SUV appeared to be following her, making every turn she was making. She began to get scared and decided to drive to the home of her friend, Hector Gallardo, who lived about one mile away. She phoned him and, in tears, asked him if he would come out because someone was following her and she was scared.

4

She testified that the white SUV tailgated her as she drove to Mr. Gallardo's home. At one point, she claims, it even tried to sideswipe her, causing her to almost hit cars parked on the side of the road. Mr. Gallardo had remained on the phone with Ms. Morfin, and as she got close to his home, she asked him to "please come out right now." RP at 201.

Mr. Gallardo was waiting outside when she arrived. She parked in front of the home. The SUV pulled in behind her and Mr. Manjares got out. He was holding a knife in his left hand. Ms. Morfin testified that Mr. Manjares asked her about Hailey and even accused her of being Hailey, "hiding in all this makeup." RP at 212. He accused Mr. Gallardo of being "the fat fuck that [was] fucking Hailey." RP at 203. Ms. Morfin told Mr. Manjares she did not know a Hailey, told him to leave her alone, and ran toward Mr. Gallardo.

Ms. Morfin then called 911. She testified that when Mr. Manjares saw that she was making the call, he "said that he was gonna come back and shoot us up." RP at 205. He then got in his car and left. She testified she thought Mr. Manjares was being serious because he "seemed very aggressive, . . . very angry" and "look[ed] like he was on drugs." *Id.*

After Mr. Manjares left, Ms. Morfin testified she was "very scared," was crying, and "closed all the blinds to the house." RP at 206. When she had called 911, she said she would go into the station and sign a statement, but when an officer called back a little

5

later to see if she was coming, she said, "[N]o, because I was scared to go outside, because I was scared [Mr. Manjares] was gonna come back." *Id.*

Mr. Gallardo testified he was outside when Ms. Morfin arrived at his house, crying and screaming. He testified that when the SUV pulled in behind her, Mr. Manjares came out "cussing and just saying stuff," and holding a knife. RP at 225-26. Mr. Manjares was accusing Ms. Morfin of being Hailey and Mr. Gallardo of sleeping with Hailey. Mr. Gallardo testified that he told Mr. Manjares to "get back," and Mr. Manjares stayed about five feet away. RP at 228. Asked if Mr. Manjares ever gestured toward him with the knife, Mr. Gallardo answered that he did not, but that Mr. Manjares was holding the knife "kind of aggressively." *Id.*

Mr. Gallardo testified that when Mr. Manjares got back into his SUV, he said "he was gonna come back there and shoot up my house." RP at 228. Mr. Gallardo thought that might happen based on how Mr. Manjares was acting.

After leaving Mr. Gallardo's home and traveling to the nearby gas station, Mr. Manjares saw the vehicle that he followed because it looked like people from Egley's. The vehicle was being driven by Daisy Perez, with Julio Ramirez in the front passenger seat. They had eaten at a fast food restaurant and were returning to Mr. Ramirez's apartment when they noticed a white SUV that appeared to be following them. When they parked at the apartment complex, the SUV pulled in and parked, and Mr. Manjares approached their car. Mr. Ramirez lowered his window to speak to Mr. Manjares and

6

asked him if something was wrong. Mr. Manjares asked if they had Hailey, Mr. Ramirez

responded "no, I think you're confusing us." RP at 123. At that point, Mr. Manjares

pulled a knife from his pocket. He swore at Mr. Ramirez, accused him of knowing where

Hailey was, and began swinging his knife toward Mr. Ramirez. Mr. Ramirez testified

that he raised his window as quickly as he could and told Ms. Perez they should leave.

She put the car in reverse, drove off, and they called the police.

Thereafter, a Sunnyside police officer heard radio traffic about an attempted

assault involving a man in a white SUV. The SUV was described as being near the

officer's location. When he saw Mr. Manjares's SUV traveling at a high rate of speed he

followed it and activated his lights and sirens, trying to stop it. He pursued the SUV into

an industrial area, where it eventually turned onto and drove on train tracks. When the

SUV attempted to turn off the tracks, it rolled into a canal. Mr. Manjares emerged from

the SUV angry, yelling that he was going to kill the officer. He was arrested.

The jury acquitted Mr. Manjares of the charge that he had assaulted Daisy Perez.

It found him guilty of the second degree assault of Mr. Ramirez while armed with a

deadly weapon, guilty of felony harassment of both Ms. Morfin and Mr. Gallardo, and

guilty of attempting to elude a police vehicle. Mr. Manjares appeals.

ANALYSIS

Mr. Manjares's only assignment of error on appeal is to the sufficiency of

evidence to support the felony harassment convictions. He contends that a threat to shoot

7

up a home cannot objectively create a reasonable fear of death if the threat is carried out,

explaining:

> The record indicates that Morfin and Gallardo believed Manjares was a gang member and were afraid he would come back to commit a drive by shooting against them or their house. It is understandable that this belief would cause fear. But it is not reasonable to fear that they would be killed because it is not reasonably likely that they would die, even if they were shot. Philip J. Cook, Ariadne E. Rivera-Aguirre, Magdalena Cerda & Garen Wintemute, *Constant Lethality of Gunshot Injuries From Firearm Assault: United States*, 2003-2012, American Journal of Public Health 107, no. 8 (August 1, 2017): pp. 1324-1328 (establishing gunshot lethality rate of 22% for all causes). It is true that they could be hurt, even severely, but fear of bodily injury is insufficient to prove a felony charge—it only supports the misdemeanor.
> Because it is not reasonably likely that Morfin and Gallardo would die if Manjares carried out the threat, any subjective fear of death is not reasonable.

Br. of Appellant at 10-11 (record citation and footnote omitted).

One problem with this novel argument is treating a reasonable "fear" of being

killed as the same as a scientifically-assessed "risk" of being killed. Jurors can be

expected to give the undefined word "fear" its common meaning. "Fear" is "an

unpleasant emotional state characterized by anticipation of pain or great distress and

accompanied by heightened autonomic activity esp[ecially] involving the nervous system

: agitated foreboding often of some real or specific peril." WEBSTER'S THIRD NEW

INTERNATIONAL DICTIONARY 831 (1993). Statistically analyzing risk based on data is

something else entirely.

Second, and relatedly, the rarity of being threatened, apparently seriously, with being killed calls for liberality in assessing a reasonable response. In imposing liability for a tort, we require a reasonable person to know matters "in so far as they are matters of common knowledge at the time and in the community." RESTATEMENT (SECOND) OF TORTS § 290 (AM. LAW INST. 1965). We expect a reasonable person to "exercise the power of intelligent correlation . . . with previous knowledge, belief, and experience." RESTATEMENT § 289 cmt. g. Jurors would not expect Ms. Morfin or Mr. Gallardo to *know* the likelihood they would die if Mr. Manjares returned to shoot them up or shoot up their house, as he threatened to do.

If the evidence in a case "establishes the victim's subjective fear, the issue is whether a rational trier of fact, viewing the evidence in the light most favorable to the State, could have found beyond a reasonable doubt, using an objective standard, that the victim's fear in each case was reasonable." *State v. Alvarez*, 74 Wn. App. 250, 260-61, 872 P.2d 1123 (1994), *aff'd*, 128 Wn.2d 1, 904 P.2d 754 (1995). Just as "the nature of a threat depends on all the facts and circumstances," *State v. C.G.*, 150 Wn.2d 604, 611, 80 P.3d 594 (2003), so does the reasonableness of a victim's fear. We must defer to the trier of fact's assessment of the persuasiveness of the evidence. *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004). The trial court instructed the jury on the lesser included crime of misdemeanor harassment but the jury found felony harassment. We note that in connection with another count the jury demonstrated its independent judgment: in the

9

case of Ms. Perez, the jury found Mr. Manjares not guilty of either the second degree assault charged or the lesser included crime of fourth degree assault.

The State presented evidence of Mr. Manjares's sustained, aggressive, inexplicable behavior toward two people he did not know. That, coupled with his threats to shoot them or shoot up Mr. Gallardo's home, was substantial evidence supporting an objectively reasonable fear that they would be killed if Mr. Manjares carried out the threats.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Siddoway, J.

I CONCUR:

Pennell, C.J.

Korsmo, J.

10